IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Civil Action No. 7:23-cv-00292-M-RJ

TYRANCE DREQUAN BENBOW, and
BECKY LEE LESALLE, individually, as
heir to Tyrance Drequan Benbow and as
representative of the estate of Tyrance
Drequen Benbow deceased,

      Plaintiffs,

v.

SHERIFF JOHN W. INGRAM, in his
individual and official capacities as the
Sheriff of Brunswick County, North
Carolina,
JOSH DAVIES, in his individual and
official capacities as Sergeant of the BCSO
Drug Enforcement Unit,
KEITH E. BOWLING, in his individual
capacity as a Deputy Sheriff for the
Brunswick County Sheriff's Office,
ALEXANDER MELVIN, in his individual
capacity as a Deputy Sheriff for the
Brunswick County Sheriff's Office, and
JOHNNIE BENTON, in his individual
capacity as a Deputy Sheriff for the
Brunswick County Sheriff's Office,

      Defendants.

ORDER

This matter comes before the court on the Defendants' Motion for Summary Judgment [DE

145]. Defendants argue that Plaintiff Becky Lee LeSalle[1] fails to raise genuine issues of material

---

[1] Plaintiff has not demonstrated that Tyrance Drequan Benbow, who is deceased, is a properly
named plaintiff in this case. *See* Fed. R. Civ. P. 25(a); *see also Est. of Tallman ex rel. Tallman v.
City of Gastonia*, 200 N.C. App. 13, 15, 682 S.E.2d 428, 430 (2009) (in North Carolina, "[a]n
action for wrongful death is a creature of statute and only can be brought by the personal
representative or collector of the decedent").

fact as to whether they violated the decedent's, Tyrance Drequan Benbow ("Benbow"), constitutional rights and/or state law when Benbow died in a vehicle collision during a high-speed chase. Plaintiff responds that the case should be heard by a jury. Having reviewed the entire record and for the reasons that follow, the court grants the motion and dismisses Plaintiff's claims.

## I.     Procedural History

The operative pleading in this case, Plaintiff's Amended Complaint (DE 66), alleges eight claims for relief; however, this court adopted the recommendation of Magistrate Robert B. Jones, Jr. to grant Defendants' partial motion to dismiss Counts IV, V, and VIII and, therefore, the following claims remain: "unreasonable detentions and seizures" in violation of the Fourth Amendment (Count I); "excessive force" in violation of the Fourth Amendment (Count II); failure to train employees as set forth in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (Count III); "wrongful death arising from battery" (Count VI); and "wrongful death arising from negligence" (Count VII). The case proceeded to discovery, and Defendants filed the present motion, arguing that Plaintiff fails to overcome the state and federal immunities to which they are entitled and fails to demonstrate any triable issues on the record evidence. Plaintiff counters that material factual issues exist concerning whether Defendants "seized" and used "excessive force" against Benbow in violation of the Fourth Amendment, and whether Defendants were grossly negligent in their pursuit of Benbow in violation of state law. The court has reviewed the motion, briefs, and the record presented and is now fully apprised.

## II.    Findings of Fact

Unless they cite to the record, the following findings of relevant facts are undisputed for purposes of the present motion. The court will not consider proffered "facts" supported solely by the operative pleading in this case. *See Atkins v. Glaser T*, 823 F. App'x 218, 219 (4th Cir. 2020)

2

("... 'the nonmoving party [must] go beyond the pleadings' and rely on 'affidavits, ... depositions, answers to interrogatories, and admissions on file' to prove that a genuine issue of material fact exists.") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) ("To overcome a motion for summary judgment, however, the nonmoving party may not rely merely on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial.") (cleaned up).

1.      On July 8, 2022, narcotics officers from the Brunswick County Sheriff's Office ("BCSO") were surveilling Benbow, because he was the target of a drug investigation.

2.      Defendant Alexander Melvin, Brunswick County Sheriff's Deputy and agent in the BCSO Vice Narcotics Unit, previously had in-person contact with Benbow during an investigation, after which Benbow was charged with possession with intent to sell or deliver 32 grams of marijuana and may have been charged with possession of firearms—an AR-15 and a shotgun—that were found in his vehicle. Melvin dep. 12: 21 – 14: 9, DE 148-8.

3.      Melvin did not know on July 8, 2022, whether Benbow had been convicted of these or any other felony charges. *Id.* 14: 13 – 15: 6.

4.      On another occasion, Melvin had stopped a vehicle for traffic violations and, as the vehicle was coming to a stop, the driver, Benbow, threw a bag of cocaine out of the window. Benbow was detained and the cocaine was recovered. *Id.* 16: 17-25. During this encounter, Melvin spoke with Benbow about his future and told Benbow that "he was a young man, and that he could turn his life around . . . and go a different route in life." *Id.* 24: 8-16. Benbow "showed an interest in cooperating" with investigators, but "he did not follow up with [Melvin]" and he "never proposed to give [deputies] any information." *Id.* 23: 18 – 24: 8. Benbow told Melvin that he got his drugs from South Carolina. *Id.* 24: 16-24.

3

5. In addition, Melvin had used a confidential informant at least twice to purchase cocaine or crack cocaine from Benbow in early- to mid-2022. *Id.* 19: 25 – 21: 14.

6. Melvin obtained a search warrant to track Benbow's location through a pen register and began noting his movements. *Id.* 26: 24 – 27: 21.

7. Defendant Keith Bowling, a detective assigned to the BCSO Vice Narcotics Unit, was also familiar with Benbow, as he was involved in Benbow's arrest for the charge of possession with intent to sell or deliver marijuana. Bowling dep. 17: 5-18, DE 148-9.

8. Bowling knew that Benbow had pled guilty to the charge and was sentenced to a twelve-month probationary period, after which, if successfully completed, the charge would be dismissed. *Id.* 18: 1-15. He also knew on July 8, 2022, that Benbow was neither a convicted felon nor on probation. *Id.* 18: 20 – 19: 1.

9. Defendant Josh Davies, a Sergeant for the BSCO Vice Narcotics Unit, was also familiar with Benbow. Davies assisted Melvin with the traffic stop at which Benbow threw the bag of cocaine out of his window and, previously, Davies had personal contact with Benbow at a residence in the Supply area in Brunswick County during an investigation of someone else; at that time, officers smelled the odor of marijuana coming from Benbow's vehicle and, when they started a search, Benbow attempted to flee on foot. Benbow was apprehended and officers seized narcotics and firearms from Benbow's vehicle. Davies dep. 16: 8-21; 21: 11 – 24: 9, DE 148-10.

10. A confidential informant told investigators that Benbow traveled to South Carolina to buy cocaine with another man and would return to North Carolina to sell it. *Id.* 27: 8-25.

11. On July 8, 2022, Benbow traveled to and stopped at a place in South Carolina, as evidenced by location data from a pen register, and was seen returning with another known drug

4

dealer, Damond Stanley. Investigators suspected that he "had traveled down there . . . to pick up a large amount of cocaine." Melvin dep. 28: 3-12; 31: 6-10.

12.     Five sheriff's deputies—Melvin, Bowling, Davies, Defendant Agent Johnnie Benton, and "Agent Davis"—driving unmarked vehicles were involved in surveillance to intercept Benbow on his way back from purchasing drugs in South Carolina. Bowling Dep. 23-24. They asked a uniformed deputy patrolling the area to drive by a residence belonging to Damond Stanley in Longwood, NC (Brunswick County). At approximately 6:30 p.m. or 7:00 p.m., the deputy observed two vehicles—a black Altima and a white Infiniti—belonging to Benbow and Stanley, respectively, parked at the residence. *Id.* 25: 3 – 26: 2.

13.     Davies, who supervised the surveillance, parked his vehicle at a Circle K gas station at the intersection of Longwood Road and Highway 17. Davies dep. 17-18. Bowling and Melvin were nearby; Bowling was driving a white Chrysler 300 and Melvin was driving a silver pickup truck, both unmarked with blue lights and sirens. *Id.* 27, 32.

14.     Davies saw Benbow's black Altima and a blue Acura sedan pull into the Circle K lot, and the cars "appeared to be traveling in tandem." *Id.* 19. A third car pulled in, and its driver approached Benbow, spoke to him, and "pumped Mr. Benbow's gas" for him. *Id.* 20. Benbow gave this third driver a Styrofoam to-go food tray, and the driver took it back to his car. *Id.* All three vehicles then left the gas station. *Id.*

15.     Based on his knowledge and experience, Davies believed he had seen a drug transaction between Benbow and the third driver. Davies testified that, because the investigation was focused on Benbow, who officers believed "was transporting large quantities of illicit narcotics, namely cocaine, into the Brunswick County area," none of the officers pursued the driver who received the Styrofoam food tray. Davies dep. 27: 18 – 28: 6.

5

16.     Rather, Davies and Bowling (who had parked at a McDonald's restaurant across the street) proceeded to follow Benbow's Altima and the Acura, which appeared to be following Benbow's car "extremely" closely, traveling north on U.S. Highway 17. Melvin, Davis, and Benton arrived and followed as well. A few minutes later, Davis activated his lights and pulled over the Acura as the vehicles approached and were one hundred yards away from a traffic light at the intersection of South Main Street and Highway 17; Davies pulled over to assist Davis with what they observed on the Acura to be a window tint violation. Although the officers searched the Acura after smelling the odor of marijuana, no firearms or illegal substances were found in the vehicle. Bowling dep. 48: 10-19; 56-59; Davies dep. 34-35; Melvin dep. 41-43.

17.     Benbow continued driving toward the intersection in the right lane and stopped at the red light; no vehicles were stopped in front of Benbow. Bowling followed, with Melvin and Benton in the vicinity, and Bowling stopped in the left lane one vehicle behind Benbow. When the light turned green, Bowling and Melvin observed Benbow accelerate rapidly and speed down the highway. Bowling activated his lights, siren, and body camera, pulled over to the right lane, and accelerated to close the distance. Bowling also switched on the primary dispatch channel on his radio and directed Melvin to "call the chase." Bowling dep. 59-62; Melvin dep. 47-48.

18.     Footage from Bowling's body camera reflects that, as Bowling followed Benbow north on Highway 17, he reported clocking Benbow driving at a speed of 116 miles per hour. Bowling Bodycam Video, DE 98. Melvin attempted to "keep up" with Bowling, but the vehicle he was driving could not exceed 99 miles per hour; nevertheless, Melvin was able to keep the vehicles in sight while they were on Highway 17. Melvin dep. 49-50. Bowling testified that he observed Benbow change lanes back and forth while passing a few vehicles, and speed through a major intersection at Smith Avenue. Bowling dep. 63-64.

6

19.     Benbow then ran a red light at the intersection of North Main Street and Highway 17, where vehicles were stopped, by pulling into the right turn lane, proceeding through the intersection, and driving back onto Highway 17 going north. *Id.* 64-65; Bowling Bodycam Video, DE 98.

20.     Benbow slowed after traveling through the intersection and Bowling was close behind, so as Benbow proceeded north on Highway 17 and approached the intersection of Red Bug Road, Bowling attempted to stop Benbow by completing a "precision immobilization technique," or "PIT," wherein Bowling pulled into the right turn lane for Red Bug Road to come alongside Benbow's vehicle on the right, but Benbow swerved and blocked Bowling's attempt. Bowling dep. 65-67.

21.     A PIT maneuver is designed to safely stop a fleeing vehicle when speeds are at or under forty (40) miles per hour. To complete such maneuver, a trained law enforcement officer will accelerate to pull alongside the fleeing vehicle, slow down to match the vehicle's speed, and use his or her vehicle's front side bumper to make contact with the fleeing vehicle's rear side panel, which should cause the fleeing vehicle to spin and stop. Affidavit of Mathew R. Strangman ¶ 7, DE 148-7; Bowling dep. 66-67; 69-71.

22.     Benbow made a right turn on Red Bug Road. *Id.* 68. Bowling testified that, as and after they turned, he tried to "PIT" Benbow's vehicle again two or three times "while speeds were still low." *Id.* 68; *see also* Melvin dep. 55: 18-22 (observed Bowling attempt "to position his car in a PIT maneuver . . . [a]s he turned onto Red Bug Road"). Bowling reported on the radio, "he's swerved at me a couple of times [as I'm] trying to PIT." Bowling Bodycam Video, DE 98. Melvin observed these attempts and Benbow's "attempt[s] to, in essence, defend against a PIT maneuver." Melvin dep. 49-50.

7

23.     On Red Bug Road, Benbow accelerated to speeds as high as 100 miles per hour and passed at least one car while navigating a blind curve; once he passed the curve, Bowling also passed the car and sped up to follow Benbow. Bowling dep. 83-84. After turning on Red Bug, Melvin lost sight of the vehicles and instructed Benton, who had caught up, to go around him and catch up to Bowling. Melvin dep. 50; Benbow dep. 32.

24.     Benbow proceeded to an intersection at the end of the road and approached a stop sign, swerved around the right side of a car stopped at the intersection, and turned left on Holden Beach Road without stopping. Garage Video, 19:24-19:27, DE 34. Bowling swerved around the left side of the stopped car and followed closely behind Benbow. *Id.*

25.     Melvin was following at some distance behind and radioed to Bowling something to the effect of, "Keith, we can't let [him] get to Seashore," a residential neighborhood where Benbow lived. Melvin dep. 53-54. Melvin testified that he made that statement out of concern for the Seashore Hills community, which was "frequented by pedestrians," and the fact that Melvin observed Benbow "traveling at a high rate of speed" and in an unsafe manner. *Id.* 66. Melvin also explained that he knew Benbow's history involving illegal narcotics and firearms and wanted to avoid a situation where Benbow might be "able to take up a position or barricade himself or put others in harm." *Id.*; *see also* Bowling dep. 79-80.

26.     As Benbow and Bowling drove north on Holden Beach Road, Benbow accelerated and passed a car in the opposite lane; Bowling followed him. Benbow was driving down the middle of the road, so Bowling moved to the right side to attempt another PIT maneuver, but Benbow swerved right and onto the right shoulder. The vehicles accelerated and Bowling saw that his speed was 60 miles per hour. He was straddling the center yellow line at that point and saw a red car approaching from the opposite direction. Bowling testified that Benbow decelerated and

8

abruptly veered to the left, scraping the front of Bowling's bumper before colliding with the oncoming red car. Bowling dep. 85-92.

27.     Just prior to the collision, Bowling heard Melvin's statement. Melvin dep. 54; Bowling dep. 79. Benbow was heading in the direction of Seashore Hills. Benton dep. 39: 22 – 40: 4.

28.     Upon colliding, both Benbow's car and the red car overturned; Benbow was ejected from the driver's seat onto the ground and his car landed on top of him. Bowling Bodycam Video, Melvin Bodycam Video, DE 98.

29.     Bowling stopped and maneuvered his vehicle to block traffic; he radioed for an ambulance and ran to the accident site. Bowling saw Benbow on the ground with the car on top of him and testified, "I knew there wasn't a whole lot I could do to help him at that point in time, and so I started addressing the passengers of the red car." Bowling dep. 96; *see also id.* 99 ("I looked at him several times and it appeared that he was beyond help for my training and experience.").

30.     Benton, who was following Bowling but did not observe the collision, arrived and "tried to render aid." Benton dep. 34: 7-16, DE 148-11.

31.     Benton assisted Bowling in removing three crying, injured children from the back seat of the red car, and moved them and their father away from the car. Bowling was bleeding from his hands and knees, and emergency medical personnel dressed his wounds, but he continued bleeding, so the Sheriff directed him to go to the hospital. Bowling was at the site for approximately thirty minutes before Benton drove him to the hospital. During that time, neither Bowling nor Benton checked Benbow's pulse or tried to move the vehicle off of Benbow "because

it could cause [him] to bleed further and bleed out." Bowling did not drive away in his unmarked vehicle. Bowling dep. 99-101; 111-113; Benton dep. 41-44.

32.     According to his bodycam footage, Melvin arrived at the scene shortly after the collision, approached the overturned vehicles, observed Bowling and Benton assisting the passengers of the red car, and checked on and spoke with the female passenger, who was able to sit up but was unable to stand or move out of the car. Benbow was lying on the ground a few feet away. When firefighters arrived, Melvin directed them to check on the female passenger of the red car saying, "she's the most hurt," then as they looked at Benbow, Melvin said, "we need to get this car off him and get him pulled out." After walking around and looking at the vehicles, the firefighters bent over Benbow, yelled, and clapped their hands to see whether he would respond. Melvin said, "he's got a thousand pounds on his chest." When an Emergency Medical Technician ("EMT") approached and looked at Benbow, Melvin said, "gone." The EMT responded, "he's gone? Okay." Melvin answered, "well, I would think so," and directed the EMT to the female passenger saying, "she needs to be checked first." The EMT stated that Benbow needed to be covered by a sheet. Another EMT arrived, looked at Benbow, and said, "he's still breathing." Melvin directed personnel to turn Benbow's head so that he would not choke on any blood. A firetruck containing stabilizing equipment arrived and personnel rushed to get the vehicle stabilized before they (including Melvin and Benton) rolled the vehicle aside to allow Benbow to be pulled out. Melvin Bodycam Video, DE 98. EMTs administered CPR but could not resuscitate Benbow, and he was pronounced dead.

33.     Melvin testified that, "in a triage situation, we did not have the tools or equipment to get that vehicle off of him at that point. So in a triage situation, you determine which person who's injured can be readily helped at that point, and it was apparent to me that Terrence [sic]

10

Benbow was not in any condition or environment to be helped to my medical -- you know, to me at that point was my training." Melvin dep. 62-63.

34.     Witness Chad Beasley attests that, while driving on Red Bug Road on July 8, 2022, he was "almost run off the road by Benbow and an unmarked white Chrysler 300." Beasley states that, "[a]t some point, I saw the white Chrysler 300 strike the rear of Benbow's car, causing both cars to run onto the shoulder of the road" and "[i]t looked like the white Chrysler 300 was hitting the rear of Benbow's car and causing him to swerve to maintain control of his vehicle." Aff. of Chad Beasley ¶¶ 5, 7, DE 150-5.

35.     Edys Areas,[2] the driver of the red car, wrote a statement on the date of the collision, in which he asserts:

> I saw a white car with lights and it was following another car. I saw when the white car was trying to hit on the black car. Me and [my] wife saw the same thing. It was clear to us the white car was trying to hit the black car. The white car hit the black car and the black car lost control. The black car ran into us and we flipped. People came out to help us get outside the car.

Areas Statement, DE 150-3; *see also* Areas video interview, DE 150-4 (in which Areas answers questions consistent with his statement to law enforcement).[3]

---

[2] The court notes that Plaintiff identifies this witness as "Eddy Arias," but the court will use the spelling set forth in Mr. Areas' statement. *See* DE 150-3.

[3] The court recognizes that certain evidence presented in this case may be challenged under Rule 56(c) as to its admissibility; however, no party has lodged any objection. Mindful, particularly, that it must view the evidence in the light most favorable to the non-movant, the court finds that had the case proceeded to trial, the parties' witnesses would be reasonably expected to testify consistently with their out-of-court statements. *Jeffers v. W. Virginia Div. of Corr.*, No. CV 3:19-0462, 2021 WL 2342940, at *2 (S.D.W. Va. June 8, 2021) ("Rule 56(c)(2) does not preclude consideration of inadmissible evidence if the party demonstrates that it can be 'presented in a form that would be admissible in evidence.'") (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015)); *see also Jones v. W. Tidewater Reg'l Jail*, 187 F. Supp. 3d 648, 654 (E.D. Va. 2016) (considering evidence under Rule 56(c) that was not presented in admissible form, to which the defendant did not object, because the evidence could be authenticated if plaintiff was called to do so).

11

36.     Retired Master Trooper Mathew R. Strangman of the North Carolina State Highway Patrol (NCSHP) was assigned to investigate the collision. Strangman aff. ¶ 5, DE 148-7. Strangman's investigation was "a single-issue reconstruction focused on whether Deputy Keith Bowling executed a Precision Immobilization Technique, or PIT maneuver, to force Mr. Benbow off the road during a high-speed chase." *Id.*

37.     Following his investigation, Strangman concluded:

> A PIT maneuver results in physical damage to both the executing vehicle and the receiving vehicle from this contact. I have never seen a car that executed a PIT maneuver, or that made contact with a fleeing vehicle in a failed attempt to execute a PIT maneuver, that did not have physical damage to it. Deputy Bowling's car had no physical damage to it except for a minor paint transfer on its front bumper. Because of this, in my opinion, it could not have been involved in a PIT maneuver, or in an intentional push or bump. A car executing a PIT maneuver would not have damage to its front bumper. In my opinion, the paint transfer occurred when Mr. Benbow's car briefly made contact with Deputy Bowling's car just before the collision with the car coming from the other direction. I believe this contact occurred after Mr. Benbow ran off the side of the road on his own, lost control of his vehicle, and then came back on to the road. When Mr. Benbow's car over corrected back onto the road, the rear bumper of his car touched the front bumper of Deputy Bowling's car about one second before Mr. Benbow collided with the on-coming car. I believe this minor contact was not intentional and occurred about 100 feet before Mr. Benbow struck the on-coming car.

Strangman Aff. ¶ 7; *see also* Strangman Investigative Report, DE 148-7 at 8-107.

38.     After NCSHP released Bowling's vehicle, Bowling took it to the sheriff's office repair shop where a technician "used acetone to wipe a stripe off the bumper. That was it." Bowling dep. 101; Photographs, DE 71-3.

39.     Davies arrived at the collision site after Benbow had been taken away in the ambulance. Davies dep. 43-44, DE 148-10. After Benbow's vehicle was turned back onto its tires, Davies searched the vehicle and found a bag of a white powdery substance on the driver's side floor board; he pointed out the bag to officers near him. *Id.* 44: 18 – 45: 16; 49: 24 – 50: 7. The substance "was field tested" and the result was positive for cocaine. *Id.* 63: 18 – 64: 8.

12

40.     Jon David, District Attorney for the Fifteenth Prosecutorial District of North Carolina, advised the public in a September 7, 2022 press release that the amount of cocaine found in Benbow's vehicle was 77.1 grams. DE 71-1.

## III.    Legal Standards

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. If "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" the court shall grant summary judgment. Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations and citations omitted). The court's role at the summary-judgment stage is not "to weigh the evidence and determine the truth of the matter" but, rather, "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

When the nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this initial burden, the burden then shifts to the nonmoving party to point out "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). In so doing, "the nonmoving party must rely on more than conclusory

13

allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. "Significantly, a party must be able to present the materials it cites in 'a form that would be admissible in evidence,' and supporting affidavits and declarations 'must be made on personal knowledge' and 'set out facts that would be admissible in evidence.'" *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 573 (D. Md. 2021) (quoting Fed. R. Civ. P. 56(c)(2) & (c)(4)).

While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence[,] [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.), *cert. denied*, 358 U.S. 908 (1958). It is "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* Accordingly, when the evidence, taken in the light most favorable to the nonmovant, reveals two equally plausible alternatives, a choice of one over the other would require a reasonable jury to speculate; in such instance, summary judgment is proper.

## IV. Discussion

Defendants move for summary judgment on all remaining claims, arguing primarily that Plaintiff fails to demonstrate genuine issues of material fact on the evidence presented. Thus, for the constitutional claims, Plaintiff must demonstrate genuine issues of material fact as to whether the individual Defendants violated Benbow's "clearly established" Fourth Amendment rights against unreasonable seizure and excessive force when they pursued Benbow on July 8, 2022, and

14

whether the official-capacity Defendants failed to train the individual Defendants in contravention of *Monell*, *supra*. For the state law claims, Plaintiff must establish the existence of material factual issues concerning whether the individual Defendants' alleged conduct occurred outside the scope of official authority, was done with malice, or was corrupt, and whether the official-capacity Defendants waived governmental immunity. The court will address each issue in turn.

### A. Individual Defendants' Qualified Immunity for Federal Claims

A law enforcement officer is entitled to qualified immunity from civil liability unless he or she (1) violated a federal statutory or constitutional right, and (2) the unlawfulness of his or her conduct was clearly established at the time. *Hulbert v. Pope*, 70 F.4th 726, 732 (4th Cir.), *cert. denied*, 144 S. Ct. 494, 217 L. Ed. 2d 259 (2023) (citing *District of Columbia v. Wesby*, 583 U.S. 48, 63-63 (2018)) (cleaned up). Because qualified immunity shields such officers "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated," lawsuits against the officers are typically dismissed against "all but the plainly incompetent or those who knowingly violate the law." *Id.* (citing *Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020) and *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Therefore, if, on the undisputed facts, Defendants' "actions could reasonably have been thought consistent with" Benbow's Fourth Amendment rights, Defendants are entitled to qualified immunity as a matter of law. *Id.* at 733 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

A "clearly established" right must be defined with specificity; this is "particularly important in excessive force cases." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . . An officer cannot be said to have violated a clearly

15

established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 42-43 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). Courts "must examine the specifics of the existing precedents, determining whether the particulars of those cases would place a reasonable law-enforcement officer on notice that particular conduct is unlawful." *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 423 (4th Cir. 2020) (Richardson, J., dissenting) (citing *Kisela*, 584 U.S. at 104).

Here, Plaintiff argues that Bowling violated Benbow's Fourth Amendment rights against unreasonable seizure and excessive force when Bowling "struck" or "rammed" Benbow's vehicle during a high-speed chase and caused the collision that led to Benbow's death. DE 149.[4] Plaintiff identifies no intentional conduct nor actions by individual Defendants Ingram, Davies, Melvin, or Benton that caused harm to Benbow and purportedly violated his constitutional rights.[5] *See id.*; *see also* DE 154 ("Plaintiff makes no argument as to why any defendant except Deputy Bowling would be liable."). The court finds Defendants have met their initial burden under Rule 56 of proffering evidence demonstrating the existence of no genuine issues of material fact regarding Plaintiff's Fourth Amendment claims against Ingram, Davies, Melvin, and Benton in their individual capacities. *See United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 252 (4th Cir. 2022) (The relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

---

[4] As Defendants point out, this theory is somewhat different than that presented in the operative pleading, i.e., that Bowling's attempt to PIT Benbow's car caused the collision. *See* Am. Compl. ¶¶ 22, 29-38, 47-48, DE 66.

[5] "The Fourth Amendment protects persons who have been personally subjected to a 'governmental termination of freedom of movement through means intentionally applied' that are unreasonable." *Schultz v. Braga*, 455 F.3d 470, 482 (4th Cir. 2006) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989)).

16

must prevail as a matter of law.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Plaintiff may not simply rest on the allegations in the operative pleading. *See Bandy v. City of Salem*, 59 F.4th 705, 709–10 (4th Cir. 2023) ("[T]he nonmoving party must [] go beyond the pleadings and affidavits and show that there are 'specific facts showing that there is a genuine issue for trial.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Even had Plaintiff argued that Ingram, Davies, Melvin, and/or Benton engaged in unconstitutional conduct, the court finds that Plaintiff fails to meet her burden to show that any of the individual Defendants violated a right that was clearly established under the Fourth Amendment. *See* DE 146 at 23. The high-speed chase in this case occurred in July 2022, and no party disputes that Plaintiff contends Benbow's rights were violated when Bowling "struck" or "rammed" Benbow's vehicle during the chase and caused the collision that led to Benbow's death. Assuming that Bowling engaged in this conduct, to overcome Defendants' entitlement to qualified immunity, Plaintiff must show that the "contours" of Benbow's right "were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Emmons*, 586 U.S. at 42-43. In analyzing whether a right is sufficiently definite, "courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999)).

The individual Defendants argue that they are entitled to qualified immunity, both because the evidence does not demonstrate material factual issues concerning a Fourth Amendment violation and because Plaintiff cannot show that Benbow's rights were clearly established. DE 146 at 23. In response, Plaintiff cites two cases in support of her contention that Benbow's Fourth

17

Amendment rights were clearly established. First, in *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court held that an officer did not violate the Fourth Amendment by "ramming" the car of a fugitive whose reckless driving "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id.* at 384. Second, in *Abney v. Coe*, 493 F.3d 412 (4th Cir. 2007), the Fourth Circuit held reasonable under the Fourth Amendment a deputy's conduct in "ramming" his car into the back of a motorcycle whose driver was fleeing from police and had crossed double yellow lines trying to pass other vehicles, ran another vehicle off the road, collided with the deputy's vehicle, and drove around a different police vehicle parked directly in his path. *Id.* at 416-17. Plaintiff contends that while these cases undoubtedly stand for the proposition that "ramming" a vehicle driven by a fleeing suspect whose driving endangers the lives of others is reasonable under the Fourth Circuit, the decisions also establish (by implication) the inverse, i.e., that such conduct against a suspect whose driving is *not* reckless violates the Fourth Amendment. The court is not convinced.

As recently as 2019, the Supreme Court emphasized the importance of defining a right with specificity for it to be "clearly established," particularly "in excessive force cases." *Emmons*, 586 U.S. at 42. "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue ...." *Id.* at 42-43. Plaintiff is correct that the facts of a Supreme Court or Fourth Circuit decision need not be identical to the facts of her case for her right to be "clearly established"; however, "the right's contours [must be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*

Thus, under Plaintiff's theory, it is clearly established for qualified immunity purposes that a law enforcement officer has violated the Fourth Amendment when he, utilizing his lights and siren,[6] pursues a driver who will not stop but is otherwise complying with traffic laws, and the officer rams the vehicle such that it loses control and collides with another car, and such collision causes the driver's death. Plaintiff cites no decision from the Supreme Court or the Fourth Circuit establishing this right, and it cannot be implied from *Scott* nor *Abney*; such fact pattern did not exist in either case and the courts made no rulings on such facts. Moreover, the cases referenced by Plaintiff are not persuasive regarding the matter for which they are cited. The court in *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018) addressed whether a pretrial detainee's due process rights were clearly established and mentions nothing about the "specificity" required in excessive force cases. In *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019), the court did address a Fourth Amendment excessive force claim but found that the right allegedly violated—police officers' discharge of firearms at a driver who may have used his vehicle to harm the officers—fell "well within the ambit of clearly established law," a 2005 Fourth Circuit opinion directly on point. *Id.* (citing *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005)).

In 2015, the Supreme Court noted that it had "considered excessive force claims in connection with high-speed chases on only two occasions" since its 2004 opinion in *Brosseau v. Haugen*, 543 U.S. 194 (2004), and had "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Mullenix v. Luna*, 577 U.S. 7, 14–15 (2015) (citing *Scott*, 550 U.S. at 384 and *Plumhoff*

---

[6] The court acknowledges that one of Plaintiff's witnesses attests that the pursuing Defendants, including Bowling, "all had on their blue lights, but none of them were using sirens." Aff. of Chad Beasley ¶ 10, DE 150-5. However, the audio footage from Bowling's bodycam reflects the sound of the siren in his vehicle as he pursued Benbow. Bowling Bodycam Video, DE 98; *see Scott*, 550 U.S. at 380 (when ruling at summary judgment, facts should be viewed in the light depicted by the videotape and courts should not adopt a version of the facts blatantly contradicted by the record).

19

*v. Rickard*, 572 U.S. 765, 777 (2014)). In *Mullenix*, the Court likewise found that neither it nor circuit courts of appeals had issued decisions "clearly establish[ing] that deadly force [wa]s inappropriate in response to conduct like [the defendant's]," described as an 18-minute high-speed chase during which the defendant, suspected to be intoxicated, called and told a police dispatcher that he had a gun and threatened to shoot police officers if they did not abandon their pursuit. *Id.* at 9, 15-17.

Since the issuance of these cases and prior to the July 2022 incident here, the Supreme Court has not addressed any disputes involving a driver who had failed to stop when pursued by law enforcement and whose death resulted when the driver lost control and collided with another vehicle after the officer rammed his vehicle. Further, the Plaintiff cites and the court has found no Fourth Circuit cases demonstrating that Benbow's specifically defined right is clearly established.

In sum, Plaintiff fails to produce evidence demonstrating material factual issues as to whether Defendants Ingram, Davies, Melvin, and Benton, in their individual capacities,[7] violated Benbow's rights against unreasonable seizure and excessive force. Additionally, all individual Defendants assert entitlement to qualified immunity from liability for Plaintiff's Fourth Amendment claims, and Plaintiff fails to demonstrate, as a matter of law, that the right allegedly violated was clearly established such that the individual Defendants would have understood that they were violating it.[8] Accordingly, Defendant's motion is GRANTED and Plaintiff's Fourth Amendment claims against Defendants in their individual capacities are DISMISSED.

---

[7] Defendants also contend that, to the extent Plaintiff relies on a supervisory liability theory, the evidence fails to demonstrate any liability on the part of Ingram and Davies in their roles as supervisors. Plaintiff tenders no such argument and, thus, the court will not address the theory.
[8] In light of this finding, the court need not proceed to determine if genuine issues of material fact exist concerning whether Bowling, by his conduct, violated Benbow's Fourth Amendment rights. *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 238 (4th Cir. 2021) (finding that a determination of the "clearly established" prong "end[ed] [the court's] inquiry"); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (courts are "permitted to exercise their sound discretion in

**B.** *Monell* **Claim against Official Defendants**

Plaintiff also alleges Fourth Amendment claims against Defendants Ingram and Davies in their official capacities as Sheriff and Drug Enforcement Unit ("DEU") Supervisor, respectively.[9] Plaintiff confirms in her briefing that she alleges these Defendants' failure to train as a basis for liability under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978).

To hold a county liable for a constitutional violation under § 1983, a plaintiff must show that the execution of a policy or custom of the county caused the violation. *Misjuns v. City of Lynchburg*, 139 F.4th 378, 384 (4th Cir. 2025) (citing *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 195 (4th Cir. 1994) and *Monell*, 436 U.S. at 694). "A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Id.* (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). "No matter which of these paths a plaintiff takes, the official policy itself must inflict the alleged injury for the municipality to be liable under § 1983." *Franklin v. City of Charlotte*, 64 F.4th 519, 536 (4th Cir. 2023) (cleaned up).

In this case, Plaintiff asserts that summary judgment is improper as to whether Defendants Ingram and Davies are liable under (3). DE 149 at 18-19. Specifically and summarily, Plaintiff argues that "Defendant Bowling's decision to ram a car into oncoming traffic on July 4 weekend

---

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

[9] A claim against a public official in his official capacity is "essentially a claim against" the governmental entity that the official represents. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).

when a car filled with a family was coming is indicative of a [sic] utter failure in training and Defendant County's obvious failure to train." DE 149 at 19.

The Fourth Circuit instructs that "a single incident is almost never enough to warrant municipal liability," because liability under *Monell* "cannot be predicated on a theory of respondeat superior." *Est. of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020). However, the Supreme Court has recognized the "possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bd. of the Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

In *Jones*, the Fourth Circuit addressed whether a single incident of alleged excessive force was sufficient to support a claim of municipal liability. 961 F.3d at 671-72. The court found that the defendant city employed a use-of-force policy, which the plaintiff did not contest as facially unreasonable but argued, like in this case, that "this tragic incident makes obvious that the policy was not sufficiently implemented in training." *Id.* at 672. The court determined that, although the incident involved the actions of five officers, which "a reasonable jury could find ... violated the [applicable] policy," these actions occurred at the same time and, thus, would have provided the city insufficient "notice of the need to better train its officers." *Id.* Accordingly, the court concluded that the plaintiff failed to show "deliberate indifference to the need for better or different training on the use of force" and affirmed the district court's dismissal of the claim.

*Jones* governs this matter. Here, no party disputes that Brunswick County employs a written policy titled, D-01 Emergency Vehicle Operation and Pursuits ("pursuit policy"), which governs incidents like that alleged here. *See* Rule 30(b)(6) depo. 16: 2-19, DE 150-8. Sammy

22

Turner, Defendants' Rule 36(b)(6) designee, testified (without rebuttal) that Brunswick County officers are required to review and are trained as to all policies and procedures, including the pursuit policy. *Id.* The Plaintiff does not argue that the policy is deficient or facially unreasonable. Rather, Plaintiff contends that the single incident involving Benbow is "indicative of [an] utter failure in training and Defendant County's obvious failure to train." DE 149 at 19. Plaintiff also implies that the evidence demonstrates Bowling violated the policy.[10] As in *Jones*, this single incident is insufficient to put the County on notice of a "need to better train its officers" and, thus, Plaintiff "cannot prove that any deficiency in training reflected a deliberate or conscious choice by a municipality." 961 F.3d at 672 (cleaned up). Because Plaintiff cannot show the County's deliberate indifference to Benbow's Fourth Amendment rights, her *Monell* claim fails as a matter of law. *See id.* Accordingly, Defendant's motion is GRANTED and Plaintiff's Fourth Amendment claims against Defendants in their official capacities are DISMISSED.

### C. State Law Claims

A federal district court may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). But the court also "may decline to exercise supplemental jurisdiction" when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). The Fourth Circuit instructs that "[a] court has 'wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.'" *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)). When determining whether to decline

---

[10] According to Turner, subsection 4 of procedure section 6 of the pursuit policy provides, "Sheriff's officer vehicles will not be used to ram, bump, push, or physically force a vehicle off the road, or to a stop unless the use of deadly force would be authorized." Rule 30(b)(6) depo. 41: 19- 42: 7.

supplemental jurisdiction, a court considers judicial economy, convenience, fairness, and comity under the circumstances presented in the case. *See Banks v. Gore*, 738 F. App'x 766, 773 (4th Cir. 2018) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Here, given the age of the case, the extensive work already performed by the parties and the court, and the fact that all of Plaintiff's claims arise from the same set of facts, this court will exercise its pendent jurisdiction to hear Plaintiff's state law claims.

Plaintiff's remaining state law claims are alleged in Counts VI (wrongful death by battery) and VII (wrongful death by negligence) of the Amended Complaint. *See* DE 66. Defendants argue that the evidence fails to reflect any material factual issues as to whether Defendants "battered" Benbow, whether Defendants engaged in "gross negligence" as necessary to establish liability, and whether Benbow was contributorily negligent in causing his injuries. Defendants also contend that they are entitled to public official immunity in their individual capacities and governmental immunity in their official capacities. Plaintiff counters that the evidence supports a finding that the factors necessary to consider for gross negligence in North Carolina weigh against the Defendants.

### 1. Public Official Immunity for Individual Defendants

North Carolina presumes that public officials, including law enforcement officers, act fairly, impartially, and in good faith. *White v. City of Greensboro*, 586 F. Supp. 3d 466, 482 (M.D.N.C. 2022) (citing *In re Annexation Ordinance No. 300-X*, 304 N.C. 549, 284 S.E.2d 470, 472 (1981)). As such, the state recognizes a public official's immunity, which "precludes suits against public officials in their individual capacities and protects them from liability 'as long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption.'" *R.A. v. Johnson*, 36 F.4th 537, 542 (4th Cir. 2022) (quoting *Hart v. Brienza*, 246

24

N.C. App. 426, 431, 784 S.E.2d 211 (2016)). Thus, to overcome the presumption, a plaintiff must "show[] that the defendant-official's tortious conduct falls within one of the immunity exceptions, i.e., that the official's conduct is malicious, corrupt, or outside the scope of official authority." *Id.* at 544 (quoting *Epps v. Duke Univ., Inc.*, 122 N.C. App. 198, 205, 468 S.E.2d 846 (1996)); *see also Wilcox v. City of Asheville*, 222 N.C. App. 285, 288, 730 S.E.2d 226 (2012) (public officials' actions are not shielded if they were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt."). In this case, Plaintiff alleges claims against Defendants based on the high-speed pursuit and on the Defendants' conduct after the collision.

### a. High-Speed Pursuit

In response to the present motion, Plaintiff argues that the immunity does not apply in this case because Bowling acted with malice when he "rammed" Benbow's vehicle.[11] Plaintiff mentions nothing about her intentional tort (battery) claim but points out that the North Carolina Supreme Court has determined that "in *any* civil action resulting from the vehicular pursuit of a law violator, the gross negligence standard applies in determining the officer's liability."[12] *See Parish v. Hill*, 350 N.C. 231, 238, 513 S.E.2d 547, 551 (1999) (emphasis in original). In North Carolina, a finding of gross negligence may pierce an officer's absolute immunity under the public official immunity doctrine. *Hatcher v. Rodriguez*, No. COA23-1108, -- S.E.2d --, 2025 WL

---

[11] Like her federal claims, Plaintiff does not argue in her response brief that Ingram, Davies, Melvin, or Benton engaged in any conduct that violated state law.

[12] In concluding that the public official immunity doctrine applies to the intentional tort of battery in North Carolina, a court in the Middle District of North Carolina relies on a decision from the North Carolina Court of Appeals finding that "battery, specifically, 'need not necessarily be perpetrated with malice, willfulness or wantonness' but, instead, 'may be supplied by grossly or culpably negligent conduct.'" *Maney v. Fealy*, 69 F. Supp. 3d 553, 565 (M.D.N.C. 2014) (quoting *Lynn v. Burnette*, 138 N.C. App. 435, 531 S.E.2d 275, 279 (2000)). Thus, assuming without deciding that Plaintiff's battery claim is properly considered under the facts of this case (i.e., injury arising from the defendant officer's vehicular pursuit of an alleged "law violator"), the court will evaluate whether public official immunity applies for both Counts VI and VII.

1699164, at *6 (N.C. Ct. App. June 18, 2025); *see also Morgan v. Spivey*, No. 5:16-CV-365-FL,

2017 WL 4399539, at *10 (E.D.N.C. Sept. 29, 2017) (citing *Cooper v. Sheehan*, 735 F.3d 153,

160 (4th Cir. 2013)) (concluding that allegations "of malicious or corrupt acts, or acts outside the

scope of duty, can overcome [public official] immunity in North Carolina, including in the context

of a claim of gross negligence"); *but see Est. of Long by & through Long v. Fowler*, 378 N.C. 138,

150, 861 S.E.2d 686, 696 (2021) (for purposes of determining the plausibility of a punitive

damages claim under N.C. Gen. Stat. § 1D-15, "'[w]illful or wanton conduct' means more than

gross negligence").

    Although most cases following *Parish* involve the injury(ies) or death of a third person not

involved in the chase, this court has found no opinion distinguishing the standards in *Parish* and

its progeny from a case involving the death of the person pursued.[13]  "[G]ross negligence has been

defined as wanton conduct done with conscious or reckless disregard for the rights and safety of

others . . . [and] an act is wanton when it is done of wicked purpose, or when done needlessly,

manifesting a reckless indifference to the rights of others." *Est. of Graham v. Lambert*, 282 N.C.

App. 269, 275, 871 S.E.2d 382, 387 (2022), *rev'd on other grounds*, 385 N.C. 644, 898 S.E.2d

888 (2024)[14] (quoting *Parish*, 350 N.C. at 239, 513 S.E.2d at 551-52). "North Carolina's standard

---

[13] In fact, Plaintiff relies on cases following *Parish*. Moreover, *Parish* and its progeny cite N.C. Gen. Stat. § 20-145, which exempts police officers from obeying speed limits under certain circumstances. *See* 350 N.C. at 273, 513 S.E.2d at 551. Although such citation might indicate that *Parish* applies only when injuries arise from an officer's high-speed collision with another vehicle, *Parish* itself demonstrates that its standards apply even when an officer's speed does not cause or contribute to the injury. *See id.* at 235 (driver crashed into decedent's residence after "losing" police officers who slowed their pursuit to avoid crashing into a tractor-trailer); *see also id.* at 245 ("when defendant's vehicle crashed on U.S. 70 on its way to Durham, Lieutenant Eubanks and Officer Dean were well behind defendant's vehicle and were traveling at a reduced speed.").

[14] The North Carolina Supreme Court specifically addressed questions concerning *governmental* immunity only: "we do not reach the question of whether the evidence taken in the light most favorable to the Estate raises a genuine issue of material fact on Officer Lambert's gross negligence as it relates to the individual capacity claim." *Id.* at 646–47, 898 S.E.2d at 892; *see also State v.*

of gross negligence, with regard to police pursuits, is very high and rarely met." *Graham*, 282 N.C. at 275, 871 S.E.2d at 387 (quoting *Eckard v. Smith*, 166 N.C. App. 312, 323, 603 S.E.2d 134, 142 (2004), *aff'd*, 360 N.C. 51, 619 S.E.2d 503 (2005)). "Although issues of negligence are generally not appropriately decided by way of summary judgment, if there are no genuine issues of material fact, and an essential element of a negligence claim cannot be established, summary judgment is proper." *Id.* (quoting *Norris v. Zambito*, 135 N.C. App. 288, 293, 520 S.E. 2d 113, 116 (1999)).

In North Carolina, when determining whether an officer's actions constitute gross negligence, courts must consider: "(1) the reason for the pursuit, (2) the probability of injury to the public due to the officer's decision to begin and maintain pursuit, and (3) the officer's conduct during the pursuit." *Id.* (quoting *Greene v. City of Greenville*, 225 N.C. App. 24, 27, 736 S.E.2d 833, 836, *review denied*, 367 N.C. 214, 747 S.E.2d 249 (2013)).

Quoting *Greene*, the court in *Graham* found that "[r]elevant considerations under the first prong include whether the officer was attempting to apprehend someone suspected of violating the law and whether the suspect could be apprehended by means other than [a] high speed chase." *Id.* In this case, Bowling participated as a law enforcement agent in the drug trafficking investigation involving Benbow and was following Benbow's vehicle after Davies observed what he believed to be an illegal drug sale between Benbow and a third party. Once Benbow realized the car closely trailing him had been pulled over by law enforcement, Benbow accelerated and drove away at rates well over the speed limits and Bowling (and others) followed with sirens and lights flashing. Benbow failed to accede and pull over.

---

*Barker*, 294 N.C. App. 596, 599, 903 S.E.2d 865, 868 (2024) (recognizing that the North Carolina Supreme Court in *Graham* "only considered the claims against the officer in his official capacity and against the city, as our decision regarding the claims against the officer in his individual capacity was not appealed.").

Plaintiff argues that Benbow "was not driving recklessly and did not pose a danger to officers or other drivers on the road" (DE 149 at 20), but the objective evidence (described herein) demonstrates otherwise. In addition, Plaintiff asserts that Bowling knew where Benbow lived and that Benbow was headed to his residence, so there was no need for the high-speed chase; however, Melvin testified that the officers did not want Benbow to reach his residence because they observed his reckless driving at high speeds and were concerned Benbow's neighborhood might be "frequented by pedestrians," and they knew Benbow's history involving illegal narcotics and firearms and wanted to avoid a situation where Benbow might be "able to take up a position or barricade himself or put others in harm." Melvin dep. 53-54; *see also* Bowling dep. 79-80. Further, Plaintiff contends that Bowling knew Benbow had been previously cooperative with law enforcement "with no issues" (DE 149 at 20); however, Plaintiff also concedes that while Defendants had no knowledge of Benbow acting violently, they did know that he had "fled." *Id.* at 4; *see also* Davies dep. 16: 8-21; 21: 11 – 24: 9 (Davies recalled an investigation where officers smelled the odor of marijuana coming from Benbow's vehicle and, when they started a search, Benbow attempted to flee on foot; Benbow was apprehended and officers seized narcotics and firearms from Benbow's vehicle). The court finds no genuine issues of material fact as to whether Bowling's reason for pursuing Benbow at a speed above the speed limit was valid and lawful.

"When assessing prong two, [courts] look to the (1) time and location of the pursuit, (2) the population of the area, (3) the terrain for the chase, (4) traffic conditions, (5) the speed limit, (6) weather conditions, and (7) the length and duration of the pursuit." *Graham*, 282 N.C. at 276, 871 S.E.2d at 387. Here, the undisputed facts reflect that the chase occurred during a clear, summer evening in July when it was still light outside. The parties traveled along a four-lane highway for a few miles, then along a two-lane main road before turning onto the two-lane road at which the

28

collision occurred. According to Bowling's bodycam footage, while Bowling followed Benbow north on Highway 17 (55 mph speed limit), he reported clocking Benbow driving at a speed of 116 miles per hour. Bowling testified that he observed Benbow change lanes back and forth while passing a few vehicles, and speed through a major intersection at Smith Avenue. Benbow then ran a red light at the intersection of North Main Street and Highway 17, where vehicles were stopped, by pulling into the right turn lane, proceeding through the intersection, and driving back onto Highway 17 going north. Melvin testified that he attempted to "keep up" with Bowling and Benbow, but the vehicle he was driving could not exceed 99 miles per hour. Benbow turned right on Red Bug Road (40 mph speed limit), and Bowling testified that Benbow accelerated to speeds as high as 100 miles per hour and passed at least one car while navigating a blind curve; once he passed the curve, Bowling also passed the car and sped up to follow Benbow. Benbow then proceeded to an intersection at the end of the road and approached a stop sign, swerved around the right side of a car stopped at the intersection, and turned left on Holden Beach Road without stopping. Bowling swerved around the left side of the stopped car and followed closely behind Benbow until Benbow collided with the oncoming red car.

According to bodycam footage, the chase lasted approximately three-and-a-half minutes. *See also* DE 148-7 at 20. Bowling testified that traffic on Highway 17 was not heavy and, while he and Benbow passed at least two cars (one stopped at an intersection) on Red Bug Road, nothing in the record indicates that many, or even several, members of the public were in range of the pursuit and in danger. Although there is always a risk of danger during a high-speed chase, under the circumstances presented here, the court finds the probability (as opposed to the possibility) of injury to the public was low and that these facts are insufficient to raise genuine material issues as to whether Bowling was grossly negligent.

The third prong analyzes the officer's conduct. *Graham*, 282 N.C. App. at 276, 871 S.E.2d at 388. "Whether an officer's behavior during pursuit amounted to gross negligence is an issue of law to be determined from the evidence." *Greene*, 225 N.C. App. at 26, 736 S.E.2d at 835. "Relevant factors include (1) whether an officer made use of the lights or siren, (2) whether the pursuit resulted in a collision, (3) whether an officer maintained control of the cruiser, (4) whether an officer followed department policies for pursuits, and (5) the speed of the pursuit." *Id.* at 27-28, 736 S.E.2d at 836 (citation omitted). In *Graham*, the court noted that in prior "high-speed chase" cases, in which courts found that officers "failed to use emergency lights, sirens, and headlights," "violated generally accepted standards regarding high speed driving and police chases," and "sp[ed] during the pursuit," the courts "concluded that the officers' conduct at most amounted to negligent discretionary acts but did not rise to the level of gross negligence." *Graham*, 282 N.C. App. at 277, 871 S.E.2d at 388.

In this case, Plaintiff contends that the evidence demonstrates Bowling did not use his siren, "intentionally collided with Decedent's car when he rammed it," failed "to keep his vehicle under control and nearly ran [another driver] off the road," and "passed a vehicle in the opposite lane of traffic when he first turned on Holden Beach Road." DE 149 at 21. Plaintiff asserts that Bowling's "decision to ram Benbow was utterly unnecessary, wanton and indicative of a purpose to harm." *Id.* at 22. Defendants counter that Plaintiff fails to point to any evidence of "intentional ramming" and that their expert witnesses and other evidence contradict any such assertion.

The court finds that a reasonable juror, presented with the evidence produced here, including Bowling's bodycam footage, video from the garage at the corner of Red Bug Road and Holden Beach Road, photographs of Bowling's vehicle post-collision, and results of the state trooper's investigation, could not conclude that Bowling failed to use his siren or maintain control

30

of his vehicle, or "intentionally rammed" Benbow's vehicle such that it collided with the oncoming red car, either with a "wicked purpose" or "needlessly, manifesting a reckless indifference to the rights of others." *See Graham*, 282 N.C. App. at 275, 871 S.E.2d at 387. Even viewing in the light most favorable to Plaintiff her statements of two eyewitnesses, including the driver of the oncoming red car, asserting that it appeared Bowling was trying to or did "hit" or "strike" Benbow's vehicle, the bodycam footage and photograph of Bowling's vehicle reveal no indication that Bowling's vehicle "rammed" Benbow's vehicle, whether accidentally or intentionally. The photograph of Benbow's vehicle attached to Plaintiff's response brief reflects only minor scrapes of black paint on the right front bumper; there appears to be no dent(s) nor other damage to the vehicle. *See* DE 150-7. This minor damage is consistent with the bodycam footage and Bowling's testimony that Benbow's vehicle came in contact with his vehicle when it suddenly decelerated then veered left in front of him. Plaintiff offers nothing refuting this objective evidence. That Bowling was following too closely behind Benbow at the speeds they were driving does not rise to the level of maliciousness. The court finds no genuine dispute of material fact as to whether Bowling's conduct during his pursuit of Benbow was grossly negligent.

Weighing the factors necessary to determine whether the individual Defendants were grossly negligent and, thus, not entitled to public official immunity, the court finds Plaintiff raises no material factual issues as to whether Ingram, Davies, Melvin, Benton, or Bowling were justified in pursuing Benbow, subjected the public to no undue risk of danger, and acted without malice or reckless indifference to others' rights.

### b. Post-Collision Conduct

Plaintiff alleges that Defendants "[f]ail[ed] to render medical assistance to Benbow . . . [and] left him alive and partially trapped underneath his car" after the collision. Am. Compl. ¶¶

118-120. In the present motion, Defendants argue that they are entitled to public official immunity and that, alternatively, the evidence demonstrates Benbow contributed to his injuries by driving recklessly and dangerously. Plaintiff does not respond to these arguments and mentions nothing about the post-collision allegations in her response brief.

The court finds that Plaintiff fails to demonstrate Defendants' actions post-collision were outside the scope of their official authority, performed with malice, or corrupt. *See Craven v. Novelli*, 661 F. Supp. 3d 430, 453 (W.D.N.C. 2023), *aff'd*, No. 23-1393, 2024 WL 1952590 (4th Cir. May 3, 2024) (citing *Wilcox*, 222 N.C. App. at 288, 730 S.E.2d 226). Bodycam footage from Bowling, Benton, and Melvin reflects that the collision caused both cars to flip and Benbow to be ejected from his vehicle onto the ground, with his vehicle landing upside-down on his torso and lower body. The passengers of the other vehicle, who appeared to have worn seat belts, were not ejected. Bowling called for an ambulance just after the collision and before he ran over to the scene; he and the other Defendants, on their arrival, saw Benbow pinned underneath his vehicle and determined, with their knowledge and training, they could do nothing to assist him, so ran to the red car and assisted those passengers. A fire truck and ambulance arrived within minutes and when emergency medical personnel (EMTs) realized that Benbow was still breathing, Defendant Melvin[15] immediately directed personnel to turn Benbow's head so that he would not choke on any blood. Given the number of people who had arrived, Melvin asked for help in trying to move the vehicle off of Benbow, but the EMTs said help was soon coming. Benton, after returning from moving his vehicle out of the way of other emergency vehicles, also asked the EMTs what he could do to help with Benbow. When the firetruck containing stabilizing equipment arrived,

---

[15] At some point after Bowling and Benton assisted the other passengers of the red car, Bowling was treated by EMTs for cuts from the broken glass, then Benton drove Bowling to the hospital because the bleeding did not stop.

Melvin and Benton assisted setting up the equipment to lift the vehicle off Benbow so that EMTs could attend to Benbow. Davies, who had assisted with the traffic stop of the vehicle accompanying Benbow's, did not arrive at the collision site until after Benbow was taken away in the ambulance.

The court finds Defendants have met their initial burden under Rule 56 of proffering evidence demonstrating the existence of no genuine issues of material fact regarding whether post-collision conduct by Ingram, Davies, Melvin, Benton, and Bowling was malicious, corrupt, or outside the scope of their official duties. *See 8.929 Acres of Land in Arlington Cnty.*, *supra*. Again, Plaintiff may not simply rest on the allegations in the operative pleading. *See Bandy*, 59 F.4th at 709–10.

Accordingly, the court finds Defendants are entitled to public official immunity regarding the alleged pre- and post-collision conduct, and their motion is GRANTED. Plaintiff's remaining state law claims against Defendants in their individual capacities are DISMISSED.

### 2. Governmental Immunity for Official-Capacity Claims

The official-capacity Defendants assert governmental immunity from any state law claims alleged against them by the Plaintiff. The court notes that Plaintiff specifically names only the individual Defendants in Counts VI and VII and proffers no response to Defendants' assertion of immunity. To ensure a clear and complete record, the court will examine whether the official-capacity Defendants are entitled to immunity in this case.

Under the doctrine of governmental immunity, a county and its public officials are immune from suits alleging negligence or intentional torts in the exercise of governmental functions, unless the plaintiff shows that the county or its public officials waived immunity. *Butterfield v. Gray*, 279 N.C. App. 549, 554, 866 S.E.2d 296, 301 (2021) (citations omitted). In North Carolina,

33

"[s]heriffs, sheriff's deputies, and jailers have all been recognized as public officials who may avail themselves of the defense of governmental immunity." *Id.* Thus, in this case, Sheriff Ingram and Sergeant Davies are entitled to governmental immunity unless it is waived.

Plaintiff has not opposed the present motion in this respect; accordingly, the court must simply determine whether Defendants meet their burdens of "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Anderson v. S. Health Partners, Inc.*, No. 4:20-CV-00095-M, 2022 WL 288223, at *9 (E.D.N.C. Jan. 31, 2022) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Defendants argue that, while a county may waive governmental immunity through the purchase of liability insurance, if the policy explicitly preserves governmental immunity, then it is not waived. DE 146 at 29-31. They claim that the insurance policy at issue in this case preserves governmental immunity (see DE 148-1 through DE 148-5) and that such immunity has not been waived through a surety bond, since Plaintiff has not joined a surety as a defendant in this case. *See Butterfield*, 279 N.C. App. at 557, 866 S.E.2d at 303 ("our court has held that purchase of similar insurance policies did not waive a defendant's governmental immunity"); *see also Hill v. Medford*, 357 N.C. 650, 588 S.E.2d 467, 468 (2003) (adopting the dissenting opinion below, finding that "if sued in his or her official capacity, a sheriff is protected against tort actions by governmental immunity unless the sheriff purchases a bond pursuant to [N.C.] G.S. § 58-76-5, and then, can only be liable on tort claims to the extent of the amount of that bond.").

This court finds that the unrebutted evidence presented by Defendants Ingram and Davies demonstrates they have not waived the immunity to which they are entitled. Accordingly, to the extent that Plaintiff's state law claims are alleged against Ingram and Davies in their official capacities, Defendant's motion is GRANTED and such claims are DISMISSED.

34

## V.    Conclusion

No one disputes that high-speed police pursuits are inherently dangerous and that Benbow's death at the conclusion of the chase by the Defendant officers was tragic. However, Plaintiff faced a "high bar" in bringing claims alleging violations of the Fourth Amendment and state law against Defendants, and was unable to refute the objective evidence demonstrating no genuine factual issue as to whether the individual Defendants allegedly violated clearly established law or acted with malice against Benbow, and whether the official-capacity Defendants allegedly waived their governmental immunity or were deliberately indifferent to citizens' rights.

Therefore, Defendants' Motion for Summary Judgment [DE 145] is GRANTED and Plaintiff's remaining claims alleged in Counts I, II, III, VI, and VII are DISMISSED. The Clerk of the Court shall close this case, once the Defendants' motion pending before Magistrate Judge Jones (DE 194) is resolved.

SO ORDERED this ___26 Th___ day of August, 2025.

Richard E Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

35